**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SHAMEKA SPEED, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | No. 14-0286 |
| v. | : | |
| | : | |
| WES HEALTH SYSTEM, | : | |
| Defendant. | : | |

## OPINION

MCHUGH, J.                                      FEBRUARY 26, 2015

This case concerns sexual harassment and retaliation claims, and raises an issue of first impression in this Circuit, one addressed by only a handful of federal courts: does an employee forfeit her retaliation rights under Title VII for physically defending herself against a sexual advance after an employer fails to take corrective measures about a hostile work environment?  I am not prepared to hold as a matter of law that a woman who has endured one groping needs to endure a second in order to preserve her job.  Because there is a plausible reading of the Second Amended Complaint from which a jury could conclude that Plaintiff was fired in retaliation for reporting her harassment, and because the altercation for which Ms. Speed was purportedly fired has to be evaluated in context, I will deny Defendant's Motion to Dismiss.

## I.  Procedural Posture

This action is brought pursuant to Title VII and the Pennsylvania Human Relations Act ("PHRA").  Plaintiff Shameka Speed alleges that she was sexually harassed over the course of approximately thirteen (13) months, and Defendant failed to take any corrective measures despite oral and written notice of her harassment.  Plaintiff further avers that Defendant's hostile

work environment culminated in a direct physical advance by her alleged harasser, during which

he groped her leg, and Plaintiff felt she had no choice but to defend herself.  Defendant WES

Health System ("WES") has moved to dismiss Plaintiff's federal and state retaliation claims, and

characterizes the situation as a stand-alone workplace confrontation warranting Plaintiff's

termination.  WES argues that the larger context of ongoing sexual harassment is entirely

irrelevant to Plaintiff's retaliation claims and maintains that its discharge of Plaintiff was

inherently lawful because she admitted to striking a coworker.

## II.   <u>Factual Overview</u>

Plaintiff Shameka Speed was hired by Defendant WES Health System as a Behavioral

Health Worker in February 2012.  Sec. Am. Compl. at ¶ 11.  She was assigned to John L. Kinney

Junior High School.  <u>Id.</u>  Speed was supervised by Cornelius Edwards, Lead Clinician, who also

supervised Macon Garway, the Clinical Coordinator (and Speed's alleged harasser).  <u>Id.</u> at ¶ 12.

Plaintiff claims her work was considered excellent, and she was well-qualified to perform the

duties of her position.  <u>Id.</u> at ¶ 13.

Speed alleges that Garway sexually harassed her at work over an approximately one year

period, creating a hostile and oppressive work environment in which any reasonable female

would have been detrimentally impacted and offended.  <u>Id.</u> at ¶ 21.  Of particular note in the

context of this case, Ms. Speed is 5 ft. 8 in. tall and weighs approximately 135 lbs.  <u>Id.</u> at ¶ 35.

Mr. Garway is approximately 6 ft. 3 in. tall and weighs over 250 lbs.  <u>Id.</u>

The harassment Plaintiff allegedly suffered was overtly sexual, anatomically specific, and

crude.  It is recounted here in detail because of Justice Breyer's reminder that in workplace

retaliation cases, "[c]ontext matters."[1]

---

[1] <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 69 (2006) ("We phrase the standard in general terms
because the significance of any given act of retaliation will often depend upon the particular circumstances.  Context

III.     <u>**Facts Alleged in Plaintiff's Second Amended Complaint**</u>

Around May 2012, Garway began making sexually suggestive and lewd comments, gestures, and innuendoes toward Speed.  <u>Id.</u> at ¶ 14.  Almost on a daily basis, Garway made sexual remarks to Speed and suggested to her that they engage in sexual relations.  <u>Id.</u> at ¶ 15.  On some occasions, Garway made explicit sexual reference to Speed's body parts.  <u>Id.</u> at ¶ 16.  "For example, he would often point to private areas of her anatomy and remark that he 'wanted some of that' or 'why don't you give me some of that.'  On several occasions, he would point to her genital area and refer to it as her 'cunt' or as 'Speed cunt.'  On other occasions, he would point to his own genital areas and remark that he wanted to give her 'some of this.' "  Second Amended Complaint at ¶¶ 17–19.  Speed maintains she never encouraged this behavior in any way, but instead communicated to Garway that she found his conduct repugnant and offensive.  <u>Id.</u>, at ¶ 20.

By late November 2012, Garway's conduct escalated to a higher level of "repugnance and frequency."  <u>Id.</u> at ¶ 22.  Speed complained orally and in writing to her supervisor, Edwards.  <u>Id.</u> at  ¶ 23.  In early December 2012, Garway often pointed to Speed's vaginal area and remarked that he wanted "some of that for Christmas" or that he wanted "some Speed cunt for Christmas."  <u>Id.</u> at ¶ 24.  In December 2012, Speed was in charge of the office Christmas Pollyanna.  <u>Id.</u> at ¶ 25.  When she approached Garway in connection with listing his gift choices, he stated, "what if I want that?" and pointed to her vaginal area.  <u>Id.</u> at ¶ 26.  On another occasion in December 2012, Garway wrote a purported list of Christmas presents that repeatedly used the word "cunt."  <u>Id.</u> at ¶ 27.  Also during December 2012, Garway pointed to Speed's breasts and said he wanted to "suck on those."  <u>Id.</u> at ¶ 28.

matters.  'The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.' ").

Speed alleges that other female employees also complained about Garway's offensive and inappropriate remarks, and Defendant was therefore on notice that Garway required increased supervision. Id. at ¶¶ 29–30. After Speed complained to Edwards in late 2012, Defendant did not discharge Garway, separate him from working with Speed, or otherwise supervise him. Id. at ¶ 31. He continued to work in a position that placed him in close physical proximity to Speed. Id.

Moreover, although Edwards assured Speed that Garway was reprimanded, Edwards in fact did not respond in any way to Plaintiff's complaints of sexual harassment. Id. at ¶ 32. Speed further avers "upon information and belief" that Edwards failed to inform the Clinical Director about her harassment, "and, for his inaction, Edwards was given a written final warning." Id. at ¶ 33.

In April 2013, Garway made additional sexually suggestive and lewd remarks to Speed. Id. at ¶ 34. He also began touching and rubbing her. Id. at ¶ 36. Garway would intentionally walk close to Speed and rub his body against hers. Id. At this point, Speed feared imminent bodily harm whenever Garway made sexually suggestive remarks or approached her. Id. at 38.

On or about April 12, 2013, Garway rubbed his hands on Speed's legs. Id. at ¶ 39. She was offended, outraged, and humiliated. Id. at ¶ 40. Speed feared further offensive and unwanted physical contact, so she warned Garway not to touch her leg ever again or she would defend herself. Id. "Upon hearing that, Garway deliberately and intentionally reached out to touch the Plaintiff at which time, and for no other reason than to defend and protect herself, Plaintiff Speed struck Garway on the side of his face and he ceased his effort to touch her." Id. at ¶ 41.

Immediately after the April 12, 2013 incident, Speed again complained to Edwards.  Id. at ¶ 42.  Edwards responded, " 'if I (Edwards) have to write up Garway, I will also have to write you up,' even though he knew Plaintiff had been assaulted by Garway."  Id.  Plaintiff interpreted this comment to mean that Edwards would not truthfully report the situation, and his write-up would not reflect that Speed feared for her safety and bodily security and acted reflexively to protect herself.  Id.

After investigating Speed's complaints, Defendant WES Health System determined that Garway had in fact sexually harassed Plaintiff.  Id. at ¶ 43.  Based on the determination that Speed's complaints were founded, Garway's employment was terminated by Defendant on or about April 25, 2013.  Id.  On that same date, Defendant discharged Plaintiff as well, which she contends was in retaliation for her complaining about the sexual harassment.  Id. at ¶ 44.

## IV.    Legal Analysis

In order to establish a *prima facie* case of Title VII retaliation,[2] Plaintiff must show: "(1) the employee engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action." Abramson v. William Paterson Coll. of New Jersey, 260 F.3d 265, 286 (3d Cir. 2001).  "If the employee establishes his prima facie case, 'the familiar *McDonnell Douglas* approach applies in which the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct and, if it does so, the plaintiff must be able to convince the factfinder both that the

---

[2] Plaintiff's PHRA claims "follow the analytical model developed by the United States Supreme Court for Title VII cases."  Allegheny Hous. Rehab. Corp. v. Com., Pennsylvania Human Relations Comm'n, 516 Pa. 124, 127–28, 532 A.2d 315, 317 (1987); see also Bailey v. Storlazzi, 729 A.2d 1206, 1214 n.9 (Pa. Super. Ct. 1999) (explaining that the elements of state and federal retaliation claims, brought pursuant to the PHRA and Title VII respectively, are identical).

employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.' " Exantus v. Harbor Bar & Brasserie Rest., 386 Fed. App'x 352, 355 (3d Cir. 2010).

At this early stage, in determining whether Plaintiff states a plausible claim of retaliation under state and federal law, I must accept Plaintiff's factual allegations as true, including all reasonable inferences drawn therefrom. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

a. *The Requirement of Protected Activity*

In Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn, the Supreme Court outlined the two different types of protection afforded by Title VII's anti-retaliation provision.

> The Title VII antiretaliation provision has two clauses, making it "an unlawful employment practice for an employer to discriminate against any of his employees ... [1] because he has opposed any practice made an unlawful employment practice by this subchapter, or [2] because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a).  The one is known as the "opposition clause," the other as the "participation clause," . . . The opposition clause makes it "unlawful ... for an employer to discriminate against any ... employe[e] ... because he has opposed any practice made ... unlawful ... by this subchapter." § 2000e–3(a).  The term "oppose," being left undefined by the statute, carries its ordinary meaning, Perrin v. United States, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979): "to resist or antagonize ...; to contend against; to confront; resist; withstand," Webster's New International Dictionary 1710 (2d ed.1958).

555 U.S. 271, 274, 276 (2009).  In further interpreting the opposition and participation clauses of Title VII, the Third Circuit has held that formal and informal complaints of discrimination or harassment constitute protected activities.  Abramson v. William Paterson Coll. of New Jersey, 260 F.3d 265, 288 (3d Cir. 2001) ("[T]he complaints to [defendant], whether oral or written, formal or informal, are sufficient to satisfy the first prong of the prima facie case, provided the complaints expressed Abramson's opposition

to a protected activity under Title VII.") (citing <u>Sumner v. U.S. Postal Serv.</u>, 899 F.2d

203, 209 (2d Cir. 1990)).

In order to show that specific conduct is protected under Title VII, a plaintiff does not

need to prove the merits of the alleged underlying discrimination, "but only that he was acting

under a good faith, reasonable belief that a violation existed." <u>Sumner</u>, 899 F.2d at 209 (internal

citations omitted).  "The EEOC has qualified the scope of the opposition clause by noting that

the manner of opposition must be reasonable." <u>Johnson v. Univ. of Cincinnati</u>, 215 F.3d 561,

579 (6th Cir. 2000); <u>see</u> <u>also</u> <u>Matima v. Celli</u>, 228 F.3d 68, 79 (2d Cir. 2000) (explaining that

most circuit courts agree that "disruptive or unreasonable protests against discrimination are not

protected activity under Title VII and therefore cannot support a retaliation claim.").  Informal

complaints to management have specifically been found to fall within the scope of protection

afforded by Title VII's opposition clause.  <u>See</u>, <u>e.g.</u>, <u>Sumner</u>, 899 F.2d at 209.

Here, in viewing all facts and corresponding inferences in the light most favorable to

Plaintiff, she engaged in a protected activity on two different occasions:  (1) when she first

complained about Garway's harassment, orally and in writing, to her supervisor, Edwards, in

December 2012; and (2) when she complained of sexual harassment for a second time and

reported the incident to Edwards that led to her discharge in April 2013.  Because informal

complaints to management are considered protected activities under Title VII's opposition

clause, Plaintiff's Second Amended Complaint pleads sufficient facts to satisfy the first element

of her *prima facie* case of retaliation.

Defendant argues that Speed's "assault against Garway" does not constitute a protected

activity under Title VII or the PHRA.  This analysis misconstrues Plaintiff's claims, as she does

not contend that slapping her harasser is the sole incident of protected conduct for purposes of

establishing the first element of her *prima facie* case of retaliation claim.  Rather, in drawing all inferences in Plaintiff's favor, her two informal complaints of sexual harassment to her supervisor are the key aspects of her allegations that constitute protected activities under the statutes.  Thus, Defendant's argument that Plaintiff's physical actions taken against Garway do not constitute protected activity has no bearing on my analysis regarding the first prong of Plaintiff's *prima facie* case of retaliation, particularly given the limited record currently before this Court.

    *b.   The Requirement of Causally-Related Adverse Action*

Obviously, Plaintiff's termination fulfills the second prong of her *prima facie* retaliation case.  See Abramson, 260 F.3d at 288.  The more challenging question is causation, because "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."  Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2521 (2013).  In considering whether a causal link exists between the protected activity and adverse action, the Third Circuit considers "a broad array of evidence."  Reaves v. Pennsylvania State Police, No. 14-1555, 2015 WL 109833, at *5 (3d Cir. Jan. 8, 2015) (quoting Farrell v. Planters Lifesavers Co., 206 F.3d 271, 284 (3d Cir. 2000)).  "Such evidence may include a temporal proximity between the protected activity and the adverse action, antagonistic behavior on the part of the employer, inconsistencies in the employer's articulated reasons for taking the adverse action, or any other evidence that supports an inference of retaliatory animus."  Reaves, 2015 WL 109833, at *5.

While close temporal proximity may be enough to establish a causal link, the "mere passage of time is not legally conclusive proof against retaliation."  Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997).  Indeed, "[a] play cannot be understood on the basis of some

of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." Robinson v. Se. Pennsylvania Transp. Auth., Red Arrow Div., 982 F.2d 892, 895–96 (3d Cir. 1993).

WES asserts that Plaintiff's retaliation claims must fail because the "period of time between the allegedly protected conduct and Plaintiff's termination is far too long to demonstrate causation." Defendant's Motion to Strike or Dismiss at 8. Defendant characterizes the relevant temporal proximity as four months, reasoning that Plaintiff made her complaint about Garway's harassment in December 2012, at which time the harassment ceased until Plaintiff was terminated "for physically assaulting a coworker" on April 25, 2013. Id. Defendant's logic is faulty in two ways. First, as explained above, close temporal proximity alone is not required to establish a causal link. Robinson, 982 F.2d at 894; Williams v. Philadelphia Hous. Auth. Police Dep't, 380 F.3d 751, 760 (3d Cir. 2004) ("Here, over two months elapsed between the time Williams requested a radio room assignment and the time that he was terminated. In cases like this one, where the temporal proximity is not so close as to be unduly suggestive, we have recognized that timing plus other evidence may be an appropriate test.") (internal citations and quotations omitted); Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997) ("It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn. The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific.").[3] Given the severe and sustained sexual harassment that Plaintiff alleges she was subjected to in her workplace, and the

---

[3] See also LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232–33 (3d Cir. 2007) (considering broad array of evidence in determining whether a sufficient causal link exists); Andreoli v. Gates, 482 F.3d 641, 650 (3d Cir. 2007) (five-month time period between employee's complaint and first adverse action was, *without additional evidence*, insufficient to raise an inference of causation) (emphasis added).

alleged lack of remedial action taken by her employer despite notice, Plaintiff has alleged enough at this early stage to support an inference of retaliatory animus.[4]

Second, although four months passed between Plaintiff's initial complaint and her termination, she complained *again* to Edwards about her ongoing sexual harassment and the physical altercation that took place with her alleged harasser, Garway, on April 12, 2013. Plaintiff pleads that after her second complaint to Edwards, Defendant undertook an investigation of Garway and determined that Plaintiff's complaints "were founded and that Garway had, in fact, harassed Plaintiff SPEED sexually, whereupon Defendant WES HEALTH discharged Garway from his employment on or about April 25, 2013."  Sec. Am. Compl. at ¶ 43. She further pleads that on that same date, and for no other reason than to retaliate against her, Defendant also discharged Plaintiff.  Id. at ¶ 44.  Plaintiff's description of her exchange with her supervisor, Edwards (i.e., "if I have to write up Garway, I will also have to write you up"), might be construed as an attempt to discourage a complaint.  Id. at ¶ 42.  The allegation that Plaintiff complained to her supervisor for a second time in April is sufficient at the pleading stage to qualify as a separate, additional occurrence of protected conduct.  Consequently, the relevant temporal proximity can be construed as thirteen days, rather than four months.

Regardless of whether the relevant time period is construed as four months or thirteen days, Plaintiff's Second Amended Complaint alleges plausible facts for a jury to conclude that Plaintiff's termination was the direct result of engaging in protected conduct.  Therefore, Plaintiff's allegations satisfy the second and third prongs of her *prima facie* case of retaliation.

---

[4] At argument, Plaintiff's counsel asserted that Garway was promoted during the interim, but Plaintiff has not proceeded to amend the Complaint, so I can give no consideration to this factor in deciding this Motion.

  *c.  Is Plaintiff foreclosed from attempting to prove pretext?*

Defendant contends that even if I find that Plaintiff has pleaded a *prima facie* case of retaliation, her claims should still be dismissed because she was indisputably terminated for "physically assaulting a coworker," and her physical confrontation with Garway "was not protected conduct, but was criminal in nature, and a clear and indisputable basis for termination." Defendant's Motion to Strike or Dismiss at 8–9.[5]

Because Plaintiff specifically pleads that she was terminated for "the efforts she made to defend herself," Defendant characterizes her allegations as conceding an independent, valid, and non-retaliatory basis for termination.  Defendant further asserts that Plaintiff is estopped from challenging the veracity of Defendant's purported non-retaliatory reason for termination, as her pleadings constitute a binding judicial admission that forecloses her from even attempting to prove pretext under the McDonnell Douglas burden shifting paradigm.  See Homel v. Sun Ins. Office, Ltd., No. 92-0442, 1993 WL 56028, at *3 (E.D. Pa. Feb. 27, 1993) ("Judicial admissions are factual assertions in pleadings that bind the party who made them only in the cause of action in which they are filed.") (citing Glick v. White Motor Company, 458 F.2d 1287 (3rd Cir.1972)). In short, WES argues that regardless of the circumstances leading up to the physical altercation with her harasser, Speed's conduct in striking him necessarily justifies her firing as a matter of law.

I find the cases WES relies upon to be distinguishable on the record as it currently stands. Within this Circuit, Defendant cites one non-precedential case, Exantus v. Harbor Bar & Brasserie Rest, and in particular the panel's statement that "[c]ommitting violence in the

---

[5] At argument, defense counsel described Plaintiff's conduct in a different way at different points, including "slugging" (N.T. 12/15/14, p. 15), "slapping" (Id. at 16), and "punching" (Id. at 17).  Plaintiff's complaint alleges that she "struck Garway on the side of his face."  Sec. Am. Compl. at ¶ 41).

workplace is clearly a legitimate, nondiscriminatory reason for terminating an employee."[6]  386

Fed. App'x at 355.  Although Defendant is correct that workplace violence *may* provide an

employer with a legitimate reason for termination, the key factual inquiry is whether the

employer was truly motivated by the proffered reason, or whether it is offered as a pretext for

discriminatory animus.  In assessing this key inquiry, the Exantus Court found that the plaintiff

failed to present credible evidence casting doubt on the employer's otherwise legitimate reason

for discharging him.  Id. at 355.  Accordingly, the Court held that the employer's decision to fire

Exantus because he engaged in multiple incidents of violent and threatening conduct was not

pre-textual, and thus "no rational trier of fact could find that Exantus' termination was

retaliatory."  Id. at 355.  Finally, and of overriding significance here, the Court specifically noted

that the plaintiff did not feel physically threatened.  Id. at 354.

    In Mincey v. Univ. of Rochester, the Western District of New York entered summary

judgment for an employer where the Plaintiff admitted to striking a co-worker, holding that such

conduct "even if allegedly taken in retaliation for discriminatory acts against her, justifies her

termination."  No. 01-CV-6159T, 2006 WL 3169108, at *9 (W.D.N.Y. Nov. 2, 2006) aff'd, 262

Fed. App'x 319 (2d Cir. 2008).  The Mincey Court found no credible evidence to support

plaintiff's allegation that her co-worker struck her first, and concluded that Mincey failed to

rebut the employer's reason for discharge.  Id.  at *8.  Of significance here, Mincey's claims

focused on age and religious discrimination.  The previous verbal exchanges were insulting in

nature, not fraught with explicit sexual meaning, and they did not on any level communicate the

co-worker's desire to engage in sexual congress with her.  Here, the rather ominous nature of

---

[6] Although the Court of Appeals does not cite its non-precedential opinions, as a district court judge I believe I should consider them as persuasive authority when cited by a litigant.

Garway's sustained and specific sexual interest in Speed, as well as her allegation that he made physical contact with her first, requires that her conduct be evaluated in a different context.

Defendant relies most heavily on Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000) for the proposition that "[s]lapping one's harasser . . . is not a protected activity." I find that a close reading of Cruz, authored by then Judge Sotomayor, provides no support for dismissal of this case. There, the Plaintiff alleged that a coworker made an inappropriate remark that her "nipples [were] erect" during her lunch hour, and an argument ensued. Id. at 564. After the co-worker described plaintiff with a particularly unflattering sexual epithet, she slapped him across the face. Id. Because Cruz's only allegation of protected activity was slapping her harasser, which did not qualify under the circumstances, the Court found that she could not make out a *prima facie* case of retaliation, even if she acted "in response to Title VII-barred harassment." Id. The Second Circuit observed that although opposition to a Title VII violation "need not rise to the level of a formal complaint in order to receive statutory protection," the types of activities that are generally considered protected include complaints to management, writing letters, protesting discrimination, and expressing support of co-workers who file formal complaints. Id. The Cruz Court underscored that the scope of legal protection given to one who lodges a Title VII complaint does "not constitute a license for employees to engage in physical violence in order to *protest* discrimination." Id. (emphasis added).

Here, Speed does not contend that she struck Garway to protest his conduct, but rather that she struck him to defend against his conduct. She does not contend that he deserved to be struck, but rather that *she* deserved to be protected against his unwanted physical advances. In fact, according to the allegations in her Complaint, her intervention prevented Garway from touching her again. Furthermore, unlike the plaintiff in Cruz, Plaintiff here had previously

complained to management, and she alleges that even when the altercation occurred, she was discouraged from insisting upon a report.  The Court in <u>Cruz</u> was clearly sensitive to the importance of such nuances and specifically limited its holding to the facts before it, noting: "We need not decide here whether violence in opposition to Title VII-prohibited behavior might, in some circumstances, be protected under Title VII's retaliation provision."  <u>Id.</u> at 567.

In effect, Defendant seeks a ruling that if an employee strikes a co-worker, regardless of the circumstances, an employer's decision to terminate must necessarily be upheld in every case, even where retaliation is a plausible alternative explanation.  I am not persuaded that the law requires such a result.  At a minimum, under the totality of the circumstances discussed above, Plaintiff has alleged enough to move forward with discovery and attempt to prove pretext.

d.  *Is a per se rule precluding a victim of harassment from defending herself inconsistent with Title VII?*

Beyond arguing that Speed's specific conduct in striking Garway cannot amount to protected activity, Defendant goes farther, asserting, "For the Court to suggest that Defendant should not be permitted to fire an employee for physically striking a co-worker would fly in the face of clear precedent from the Third Circuit."  Defendant's Reply Brief at 3.  Although I agree with Defendant that violence cannot be endorsed as retaliation for, or as an initial response to, harassment, I must consider the situation facing Plaintiff at that moment.  If physically striking her alleged harasser resulted from the mindset of a person suffering ongoing harassment and fearing for her bodily security, the proposition that Title VII would not afford Speed protection under those circumstances seems inconsistent with the purposes of the statute.  As described by the Ninth Circuit, "sexual harassment is a major problem in the workplace. . . . Congress did not enact Title VII to codify prevailing sexist prejudices.  To the contrary, 'Congress designed Title

VII to prevent the perpetuation of stereotypes and a sense of degradation which serve to close or discourage employment opportunities for women." Ellison v. Brady, 924 F.2d 872, 880–81 (9th Cir. 1991).

The EEOC recommends that courts analyzing sexual harassment cases focus on the victim's perspective. Id. at 878. The purpose of considering a reasonable victim's viewpoint is meant to be used as a safeguard to ensure that stereotypical or ingrained notions of behavior do not dictate present day workplace norms. Otherwise, reasonable workplace behavior could be fashioned by male biases, or even worse, by the very offenders engaged in harassing behavior, which they may subjectively perceive as innocuous. Id. The importance of focusing on the viewpoint of a reasonable victim is exemplified by an argument made by counsel during oral argument. In the heat of zealously representing his client, Defendant's counsel characterized Garway's April 12, 2013 rubbing of Plaintiff's legs as "innocuous touching." December 15, 2014 Motion to Dismiss Hearing Transcript at 16. Although later conceding that referring to Garway's alleged groping of Plaintiff's legs as "innocuous" was a bad choice of words, defense counsel argued that a proportional response to Garway's inappropriate touching simply could not warrant physical self-defense.[7] Rather, Defendant maintains that Plaintiff should have removed herself from the situation by leaving the room, or she easily could have just pushed his hand away. WES concedes, however, that to reach this conclusion the Court would have to turn a blind eye to everything but the moment of the encounter:

> [DEFENSE COUNSEL]: This is not a claim of fear for bodily integrity or safety. This is simply, he touched her leg, she said don't. He reached out to touch her leg again, she slugged him.

---

[7] Based on a contemporaneous statement given to her employer, Defendant also argues that it is clear that Speed struck Garway because she was angry, rather than scared. However, given the early stage of this litigation, I must view the pleadings and all inferences in Plaintiff's favor, which provide ample support that Plaintiff acted in self-defense based on an imminent fear of harm.

> THE COURT:  Would I have to ignore all of the other aspects of Mr.
> Garway's previous behavior in which, apparently, if plaintiff is accurate,
> [there] were very crude references to her anatomy[, and] there was an
> expressed intent to have sexual relations with her.  Would I have to ignore
> all of that to accept your characterization of this isolated incident?
>
> [DEFENSE COUNSEL]:  Absolutely, your Honor.

Id. at 15–16.

Plaintiff counters that a jury question remains whether Plaintiff acted reflexively, or reasonably, to defend herself from what she perceived to be a threat in the face of "nonconsensual sexually offensive rubbing of Garway's hand on Plaintiff's leg."  Plaintiff's Opposition Brief at 6.  Speed argues that walking away would not have been effective in this situation, as Garway's conduct was essentially sanctioned by Defendant, in that WES' failure to act in response to her complaints empowered Garway to do as he wished.  Considering that Garway is alleged to weigh approximately twice as much as Plaintiff, and the highly specific nature of his previous comments, her allegations of feeling physically vulnerable and threatened under these circumstances are certainly plausible.  In that regard, in the psychic netherworld of sexual harassers, where "no" is often perversely interpreted as "yes," might Plaintiff's failure to act decisively be misinterpreted?  As argued by Speed's counsel, the "touching [was] on a personal part of her body and his hand [was] moving up her thigh.  That alone indicates that Mr. Garway is being allowed to be even more aggressive than he was in the first instance. . . .  The question is, what is she supposed to do?"  December 15, 2014 Motion to Dismiss Hearing Transcript at 21–22.

There is other precedent not cited by WES that addresses the issue of self-defense.  In Excel Corp. v. Bosley, 165 F.3d 635 (8th Cir. 1999), the plaintiff was subjected to ongoing sexual harassment by her co-worker ex-husband at the meat packing plant where they worked.

16

Id. at 637.  She reported the sexual harassment to management, but little or no corrective actions were taken.  Id.  Plaintiff Bosley was a line worker who could only leave her position with permission from a supervisor, but her ex-husband was a "floater," who could move freely around his workplace, and he regularly circulated the floor where Bosley worked.  Id. at 637–638.  "On the day of the firing, Bosley asked twice to be relieved of her position in an effort to get away from the harassment.  Twice the supervisor refused the request.  Finally, Bosley testified that she shoved Johnson out of the way.  As a result of this action Bosley was fired."  Id. at 639.  Under these extreme circumstances, the Eighth Circuit concluded that "if the decision making process is tainted by discrimination, the claimant is entitled to relief.  When an employee is fired because he acted to defend himself against harassment, which supervisors failed to take reasonable measures to prevent or correct, the termination process cannot be said to be free from discrimination."  Id.[8]

Going one step further than the Eighth Circuit in Bosley, a Ninth Circuit panel, in a non-precedential opinion, explicitly held that reasonable self-defense may be considered protected oppositional activity for purposes of a Title VII retaliation claim.  Folkerson v. Circus Circus Enterprises, Inc., 68 F.3d 480, at *5 (9th Cir. 1995).[9]  In Folkerson, plaintiff worked as a mime and developed a "Living Doll" act where she mimed a mechanical doll.  Id. at *1.  During one performance, a patron approached inquiring whether Folkerson was real.  Id. at *2.  Although the patron was warned not to touch Folkerson, he moved towards her with open, extended arms "as

---

[8] I note that Bosley is not directly on point because the Court was not considering a retaliation claim.  However, the case is still instructive given the similarity of the facts.

[9] Although the Folkerson opinion discussed here is technically unpublished, as noted by another district judge, "[w]hile not specifically referencing its reasoning on the protected activity question, the circuit relied on its conclusion in reaching its decision on remand [in a published opinion].  See Folkerson v. Circus Circus Enterprises, Inc., 107 F.3d 754 (9th Cir.1997)."  Van Horn v. Specialized Support Servs., Inc., 241 F. Supp. 2d 994, 1016 (S.D. Iowa 2003).

though he planned to hug her" and touched her shoulder area.  Id.  Remaining in character, Folkerson "reached up and hit the patron in the mouth."  Id.  In response, the "man laughed and the audience applauded."  Id. at *5.  Folkerson's employer viewed a videotape of the incident and concluded that "Folkerson did not have adequate provocation to hit the patron."  Id. at *2. Based on that rationale, Folkerson was fired the following day.  Id.  Folkerson "filed a Title VII sex discrimination suit alleging retaliatory discharge for engaging in protected opposition to illegal sex discrimination."  Id. at *1.

In analyzing whether Folkerson engaged in protected oppositional conduct when she hit the patron, the Ninth Circuit considered whether Folkerson's reaction was reasonable under the circumstances.  Id. at *4.  Rejecting the defendant employer's argument "that physical violence can never constitute protected opposition to unlawful discrimination," the Folkerson Court explained the importance of reasonable self-defense.  Id. at *5.

> In its more severe forms, sexual or racial harassment can involve violence.  In the criminal law context, the doctrine of self defense has developed precisely because society deems it reasonable for individuals to defend themselves against violent attacks.  "It is only just that one who is unlawfully attacked by another, and who has no opportunity to resort to the law for his defense, should be able to take reasonable steps to defend himself from physical harm."  1 Wayne R. LaFave and Austin W. Scott, Jr., Substantive Criminal Law § 5.7(a) (1986).  Because individuals may take reasonable steps to defend against physical harm, employees who do so are not engaging in "unreasonably hostile or aggressive" activity. **Reasonable defense against physical violence may be protected oppositional activity.**

Id. (emphasis added).  Noting that "[o]ppositional activity is unreasonable if it significantly disrupts the workplace or directly hinders the employee's job performance," the Court considered the reasonableness of Folkerson's response.  Id.  Viewing the evidence in her favor, the Ninth Circuit concluded that Folkerson's "conduct appear[ed] proportionate to the degree of threat this man posed."  Id.  In comparing the threat to Folkerson of an isolated incident where a stranger touched her shoulder to the far more extreme circumstances allegedly faced by Speed

18

here, it seems plainly evident that her response could be deemed proportional to the threat posed by Garway.

In 2003, following a bench trial, Judge Pratt of the Southern District of Iowa also squarely answered the question left open in Cruz.  See Van Horn, 241 F. Supp. 2d 994.  There an employee working with a special needs population was subjected to ongoing inappropriate sexual conduct by a twenty-one year old male client with Down syndrome ("KB").  Id. at 999–1002.  In addition to professing feelings of love and insisting that plaintiff Van Horn reciprocate, KB initiated physical contact on several occasions, including kissing Van Horn on the cheek and grabbing her breast.  Id. at 1000.  Fearing "that KB's inappropriate behavior was intensifying and [feeling] unsure of how to handle it," Van Horn notified her supervisor and later expressed concern at a staff meeting.  Id.  "The staff and supervisors at the meeting offered no assistance or guidance to her," and no action was taken by her employer to address the ongoing situation.  Id. at 1001.

KB's conduct continued to escalate.  Id. at 1002.  KB initiated inappropriate contact of a sexual or romantic nature with Van Horn on several different occasions.  Id.  Although Van Horn recorded her interactions with KB and filed incident reports, no remedial action was taken by her employer.  Id.  The situation culminated when KB "pinched Ms. Van Horn's right breast, near the nipple," and in "reaction to the pain, Ms. Van Horn instinctively slapped KB on the left side of his face."  Id. at 1004.  Based on the purported justification that "slapping a mentally retarded person was never justified," Van Horn's employment was terminated.  Id. at 1005.

Judge Pratt identified the "real crux of the matter" as whether physical opposition to workplace harassment can ever be considered reasonable.  Id. at 1012.  After noting that unlawful and disruptive protests against discrimination fall outside the purview of Title VII, and

recognizing that Title VII certainly does not grant employees a free license to unreasonably

engage in violence to protest discrimination, the Court concluded,

> the law is equally clear that an individual who is unlawfully attacked and has no
> opportunity to seek legal recourse may reasonably act to defend against physical harm.
> See 1 Wayne R. LaFave & Austin W. Scott., Jr., Substantive Criminal Law § 5.7(a)
> (1986).  See also Restatement (Second) of Torts §§ 63–66 (recognizing the right to the
> use of force in self-defense).  Therefore, where employees find themselves in such an
> exigency and act in their own defense, they are not engaging in "unreasonable"
> oppositional activity.  The Court reads Bosley to compel essentially the same conclusion-
> that when an employer's failure to act forces an employee to act in self-defense at the
> workplace, the employee's defensive conduct is reasonable and the employee cannot be
> terminated for doing so.

Id. 1012–13 (citing Bosley, 165 F.3d at 639).

The Van Horn Court completed its Title VII analysis by noting that employers are

generally free to maintain "zero-tolerance" policies, so long as they simultaneously protect their

workforce from unlawful harassment.  Id. at 1013–14.  Indeed, to "allow an employer to ignore

clear warning signs and then terminate an employee who resists sexual harassment and assault at

the workplace is to deny the employee the basic protection against discrimination which Title

VII affords."  Id. at 2014.

This last element of Van Horn has particular force with respect to the circumstances of

this case.  If Plaintiff can prove her allegations, the situation in which she found herself on April

12, 2013 was directly related to the failure of WES to address adequately her previous

complaints of harassment.  Even if one were to conclude that Speed's conduct in striking her

harasser was inappropriate under all of the circumstances, it would be profoundly anomalous to

protect the very employer which had failed in the first instance to protect her; but for that failure,

Plaintiff need not have confronted an escalation of Garway's behavior.

In the present posture of this case, I do not need to reach the issue of whether a physical

act of self-defense can qualify as protected activity under Title VII.  I have no hesitation,

however, in rejecting Defendant's position that Plaintiff's conduct here bars her retaliation claim. There are meaningful differences between this case and the precedent on which WES relies.  I find the careful analysis of the Eighth and Ninth Circuits, along with Judge Pratt's well-reasoned decision in <u>Van Horn</u> in facing similar facts, to be highly persuasive, and accordingly Defendant's Motion to Dismiss Speed's retaliation claims will be denied.


<u>      /s/ Gerald Austin McHugh</u>
United States District Court Judge